### Application of SOUTHERN BELL TEL. & TEL. CO.
No. 9775-TP.

Florida Public Service Commission.

July 22, 1969.

Harold B. Wahl of Loftin & Wahl and Nathan H. Wilson, both of Jacksonville, and Drury B. Thompson, Atlanta, Ga., for the petitioner.

Julius F. Parker, Jr. of Parker, Foster & Madigan, Tallahassee, for Florida Hotel and Motor Hotel Association, intervenor.

Art Hallgren, Miami, for Florida AFL-CIO.

Lewis W. Petteway, General Counsel, and B. Kenneth Gatlin, Rate Counsel, for the commission staff and the public generally.

Chairman WILLIAM T. MAYO and Commissioners JERRY W. CARTER and JESS YARBOROUGH participated in the hearings and disposition of this matter.

## BY THE COMMISSION.

*Order reducing rates and requiring refund:* Pursuant to notice, the commission held public hearings in this docket in Miami, Fort Lauderdale and Orlando on June 24, 26 and 30, 1969 on the commission's own motion for the purpose of considering the adequacy and efficiency of telephone service being rendered by Southern Bell Tel. & Tel. Co., and the making of adjustments in the company's temporary rates based on the quality of such service, if any such adjustments appeared to be warranted.

On November 26, 1968 the commission issued its order no. 4462 in this docket granting Southern Bell a temporary increase in rates under bond. In that order the commission was critical of the service being rendered by the telephone company and for that reason the increases were made on a temporary basis; and the bond was required on further consideration of the service rendered by Southern Bell.

### Review of temporary rate order

There are two portions of order no. 4462 that are particularly pertinent in considering the temporary increases and their disposition in the light of the quality of service rendered by the company. The first portion of order no. 4462 defines the service problem which existed at the time rates were increased on a temporary basis under bond. This portion of the order follows —

> "We are receiving numerous complaints from portions of the territory served by Southern Bell. In some areas, in particular, installation intervals, or the time required to install service, fall well below a reasonable standard. Operator answering time consistently meets Bell's requirements

but does not meet the standards recently adopted by this commission. By far the biggest complaint, with reference to telephone service in the Southern Bell territory, is the length of time required to obtain service, and the difficulty in obtaining definite and reliable information as to when the requested service can be obtained. *These are problems that can and must be resolved.* We have recently adopted uniform standards for telephone service, and have prescribed administrative rules requiring periodic reports which, together with field inspections, will keep the commission fully advised concerning the quality and sufficiency of telephone service being provided throughout the state of Florida. *We intend to require reasonable compliance not only with the standards but also with the reporting requirements.* Any rate adjustments, including the one in this docket, will be on a temporary basis for a reasonable period of time pending any necessary improvements in the quality and sufficiency of service."

Thus, the commission recognized a service deficiency with respect to Southern Bell's operations in the state and allowed the requested increases to become effective only on a temporary basis and under bond.

The second portion of order no 4462, which is particularly pertinent in this phase of the proceeding, has to do with the subsequent re-adjustment of the temporary rates in the light of service deficiencies, if any should exist on further consideration. This portion of the order specifies that the increased rates authorized therein would be temporary rates —

". . . to and including June 30, 1969, at which time, or as soon thereafter as conveniently possible, the commission will make a determination concerning service deficiencies, if any, *and re-adjust the rates on the basis of service rendered during the period when such temporary rates are in effect.*"

Some interpretation of this specific language seems appropriate. This particular language developed as a result of the commission's disinclination to impose even temporary increases on the public in the face of numerous service complaints without, at the same time, making some provision for appropriate refunds on a subsequent review of the *quality of service rendered during the period covered by such temporary rates.* The foregoing language, therefore, is not consistent with the view that the quality of service *presently* being provided is all that should be considered in making a final disposition of the temporary increases previously granted in this docket.

The temporary increases became effective shortly before the 1st of January 1969, and of course, are still in effect. The commission's newly adopted standards of service were in effect on January 1, 1969, and have been in effect virtually the entire period during which the temporary increases have been collected by the company under bond. Any disposition, therefore, of the temporary increases in this docket should be on the basis of the service rendered by Southern Bell during the period from January 1, 1969 to the date of the hearings in June.

*Service deficiencies*

It is obvious from the record in this proceeding that Southern Bell's greatest service problems are concentrated in South Florida — primarily in Broward and Dade counties. Something in excess of 45% of the company's subscribers are located in these two counties. The record shows, however, that some problems exist in other areas of the state served by Southern Bell.

Order no. 4462, which granted the temporary increases now under consideration, was critical of the telephone service rendered by Southern Bell in three specific categories — held applications for service, installation intervals, and operator answering times. These three categories in particular must be considered at this time —

1. Held Applications

   a. New Service

Unsatisfied applications for new service during the first five calendar months of 1969 ranged from a low of 2,451 to a high of 9,545, and on average throughout the period, exceeded historical data on this item as far back as December 31, 1963. Of additional significance is the fact that at the end of March 1969, of the 2,701 held applications aged from one to six months, 2,159 were located in the base rate area. By reference to page 1-A of late filed exhibit 3-M, it will be noted that the most significant reductions in held applications for new service, percentagewise, were effected during the month of May.

   b. Regrades

The situation with respect to unsatisfied demands for the preferred grades of service is similar to that for applications for new service. During the same period held applications for regrades ranged from a low of 7,512 to a high of 12,492 which is, again, on average high when related to historical data as far back as December 31, 1963.

## 2. Answering Times

With respect to toll operator answering times, significant improvements have been noted over test period results, which formed the basis for making the increases temporary subject to service improvements, although complete compliance with commission prescribed standards was not realized throughout the first five months of 1969. The company operates 25 toll centers throughout its service area, and the commission standard was missed in three toll offices during January, in five during February, and in one office during March. In April and May the company achieved full compliance.

Directory assistance (information) and intercept answering times were in full compliance with the commission's standard in each office throughout the period.

With respect to repair services, the company operates some 35 service centers throughout its operating area to which repair calls are directed. Answering time results for the first five months of 1969 indicate that during this period the commission's standard was not met at five service centers during January, at five centers during February, at four centers during March, at seven centers during April, and at two centers during May.

## 3. Installation Intervals

The company operates 33 plant assignment centers throughout its operating area through which its service orders are processed and installations of service are made. The record discloses that the commission's standard was not met at 26 service centers during January, at 21 centers during February, at 13 centers during March, at 12 centers during April, and at 4 centers during May. It is noted that with respect to this item, the deficiencies are more general with respect to geographical locations and are not limited to the South Florida area.

## 4. Repair Service

Repair service deficiencies was not one of the items criticized in order no. 4462 because a prescribed standard of service for this item had not been established during the original test period in this docket. However, the commission's present standard for this item has been effective since January 1, 1969, and the company's compliance with this standard should be noted at this time. The company operates some 39 repair service centers throughout its service area from which service restorations are dispatched and completed. The summary results of service interruptions clearly indicates that the commission's standard, which required that 95%

of all interruptions of telephone service shall be repaired within 24 hours, was not met at 17 of these centers during January, at 11 during February, at 11 during March, at 9 during April, and at 5 during May.

Our analysis of the quality of service rendered by Southern Bell shows, for the most part, a continuous improvement in service. However, this improvement must be weighed in the light of the fact that such improvement paralleled the reduction in demand normally associated with the so-called "busy season." On the basis of the present record, we cannot say that this is not a significant factor in the recent service improvement achievement of the company.

*Service emphasis*

Not only in Florida, but also throughout the country the emphasis in public utility regulation is primarily on service and service of a high quality. For the purpose of demonstrating this new emphasis, there was injected into this record, by the commission's staff during cross examination of company witnesses, excerpts from a talk recently made on regulatory matters by a vice president of American Telephone and Telegraph Company. The important excerpt from this talk, insofar as the present proceeding is concerned, is that —

> ". . . the regulated and the regulators *must always be vitally concerned about good service; that service must not only be good as measured by technical standards but it must be pleasing to the customer, it must be available when he wants it, and it must be tailored to meet his individual needs."* (Italics added.)

With held applications for new service during the first five months of 1969, when the temporary rates have been in effect, ranging from a low of 2,451 to a high of 9,545, and held applications for regrade ranging from a low of 7,512 to a high of 12,492, it is difficult to square Southern Bell's service in Florida with the tests advocated by AT&T's vice president. These held applications represent a lot of people to whom service is not available when they want it, and they also represent the fact that Southern Bell is not yet able to give service that is tailored to meet the individual needs of thousands of its subscribers who have need for preferred grades of service.

*Company explanation of service deficiencies*

Southern Bell has recognized that it has had a problem in meeting the demands for telephone service within its certificated service area, particularly in South Florida where a large percent of its

subscribers are served. The company blames this problem primarily on unanticipated demands for telephone service resulting from the unprecedented growth in the territory it serves. The statutes of this state (§364.03, F.S.) require that the service . . .

> ". . . to be rendered any person, by any telephone or telegraph company shall be rendered and performed in a prompt, expeditious and efficient manner and the facilities, instrumentalities and equipment furnished by it shall be safe, kept in good condition and repair, and its applicances, instrumentalities and service shall be modern, adequate, sufficient and efficient."

All telephone companies operating in Florida, including Southern Bell, are certificated by the state to render telephone service in certain specified areas "which they profess to serve," and such certificates may be cancelled for poor service and the territory assigned to another telephone company which may be able and willing to provide the necessary service. The statutory duty to provide adequate and efficient telephone service, therefore, imposes upon telephone companies in Florida a high degree of accuracy in forecasting future demands for telephone service within their respective service areas.

Back in 1967, Southern Bell became aware of the fact that its forecasts for 1968, and beyond, were far too conservative. In the latter part of 1967, it began to use plant margins in order to keep up with demands for more and more service. It soon used up such margins; and because of the nature of telephone equipment and facilities, much of which must be engineered from one to two years in advance of installation, it has not been able to catch up with increasing demands for service. What all this adds up to is that the company's forecasts have been too conservative. While this is certainly a legitimate explanation of the development of the problem, it is not necessarily a legitimate excuse for its existence. For years, Florida's growth has been phenomenal, a fact which we have recognized many times in rate orders. Through the years, Southern Bell has "normally" found it necessary to revise annual construction budgets many times before the budget period has expired. Traditionally, this company has been conservative in its forecasts; otherwise, it would not have been necessary in the past to revise almost every construction budget several times before the budgeted construction has been completed. The company has maintained substantial construction budgets from year-to-year which, normally, one would think would be sufficient to meet the telephone service requirements of its area. However, Florida, is not a "normal" state, insofar as growth is concerned, and the

failure to recognize this fact can lead to the inability of a telephone company to provide the kind of service the public wants and needs.

On cross examination, the company's two witnesses in this phase of the proceeding stated that necessary improvements will not be completed until late in 1969, and that necessary margins will not be restored fully until sometime in 1970. This fall and winter a new "busy season" will begin and without necessary margins to fall back on, the company will be faced with meeting normal demands, the increasing demands of a continuing phenomenal growth, plus the heavy demands of a new "busy season." Whether the company will be able to make sufficient progress with its improvement program to overcome its problems completely by the time the new "busy season" arrives is difficult to say. Management feels that it will, and insists that its present program will provide adequate plant and facilities to enable it to keep up with normal requirements, meet abnormal requirements due to phenomenal growth, and at the same time, restore necessary margins. The company is in the midst of implementing an accelerated program of construction which is calculated to accomplish these goals and we have no reason to anticipate that these present plans are inadequate. The present record shows marked improvement during the past five months as we have gotten further away from the normal "busy season," and as the company's accelerated or crash-program has attained significant momentum. However, the record does not demonstrate satisfactory service when measured by the commission's service standards, which the company characterized as stringent, but reasonable. The company has demonstrated a commitment in the right direction, but satisfactory improvements still are months away.

*Past precedents*

The commission has not had too much experience in the application of its new Rates and Service Law. Actually, in only one case has the commission affirmatively exercised the authority conferred by this law. The case involving the United Telephone Company of Florida affords the only situation where this law has been applied definitely and specifically. For that reason, some reference to the two orders which were entered with respect to United should be made at this point.

### 1. United's First Order

When United applied to the commission for an increase in its rates, service complaints took up most of the time of the several hearings held in that case. The commission found that the company, from a financial viewpoint, was entitled to an increase in

its rates, but that its service was not sufficiently good to warrant any increase at that time. The increase was, therefore, denied pending necessary improvements in service. The commission's decision and the new law were upheld on review by the Supreme Court of Florida. Thus, the withholding of justifiable increases has been approved by the Supreme Court when the quality of service does not meet reasonable standards.

## 2. United's Second Order

After the Supreme Court decision, United renewed its efforts to obtain rate relief. Hearings were held, and there was some testimony that service had improved considerably. However, there were some areas, growth areas, where some service deficiencies still existed. The commission granted a portion of the requested increases, and its formula in that case appears to have some relevancy in the present proceeding. The pertinent parts of this order (no. 4451, docket no. 9872-TP) are as follows —

> "The present record discloses that United Telephone Company expended $10 million improving its equipment and facilities during the year 1967. By the end of 1968, it will have expended an additional $17 million. Its construction budget for 1969 is approximately $16 million . . . Thus, the firm construction budgets for 1967, 1968, and 1969 total $43 million. Within a few weeks, the company actually will have expended a total of $27 million in its improvement program. The company is entitled to some substantial consideration for this bona fide effort to bring an improved, efficient, and adequate telephone service to its subscribers.

> "The company has requested total increases in this present proceeding of $2.8 million. Approximately $525,000 of that amount is directly concerned with miscellaneous services which are not related to quality of service.

> "The proposed increases for local exchange service total $2,294,312. However, included in this amount is $150,000 for concession telephones, that is, telephones from which no revenue is derived. Therefore, the proposed net increase in local exchange rates is $2,144,312. In view of the fact that there has been some substantial improvement in service as a result of the company's having completed 64% of its construction and improvement program, we conclude that it will be fair and reasonable to allow at this time, on a temporary and emergency basis, 64% of the increases requested in local exchange rates, said increases to be applied in the various exchanges on the same basis that the company

apportioned its proposed increases. This means that the company has advanced its improvement program to the point where it is reasonably entitled to receive 64% of the increases requested . . ."

In this present proceeding, a Southern Bell witness testified on cross examination that it was the opinion of his company's management that it must spend $411 million for construction for the years 1969 and 1970 to adequately meet its telephone service demands and eliminate its service problems to a satisfactory degree. He also testified that the company had spent $80 million by the end of May, 1969 out of its total construction budget. In this connection, he testified that additional plant has been engineered and ordered, and that installations will be made as the facilities are received. In its crash program to catch up with its telephone service demand, the company is spending $808,000 each working day, including overtime. This means that by September 1, 1969, the earliest date this order can be made effective, the company will have spent approximately $143,800,000 or 35% of its two-year construction budget. As we said in the United Telephone case, the company is entitled to some substantial consideration for this bona fide effort to bring an improved, efficient, and adequate telephone service to its subscribers. In view of the fact, therefore, that there has been some substantial improvement in service as a result of the company's crash program to provide necessary plant and facilities, which will have cost the company approximately $143,800,000 by the end of August, which in turn represents 35% of the company's two-year program, we conclude that it will be fair and reasonable to allow, at this time, on a permanent basis, 35% of the temporary increases previously authorized as they are related to quality of service. This means, of course, that the company must make some reduction in its rates and some refund to its subscribers.

## Reductions and refunds required

The temporary increases previously authorized in this proceeding, under bond, amounted to $5,775,000 on an annual basis. Approximately $2,585,000 of that amount is directly concerned with miscellaneous services and charges, which are not related to quality of service. Therefore, the temporary increases to which quality of service can be related amount to $3,190,000 on an annual basis. This is the portion of the temporary increases which are subject to re-adjustment on the basis of service deficiencies — of this amount, the company is entitled to retain 35%, on the basis of our decision in the United case. This means that the company's rates must be reduced by some $2,073,500. When the temporary increases were authorized, they included increases on business and

residence service of slightly more than $2 million, or approximately the amount that the company's rates must now be reduced.

By the 1st of September 1969, the temporary rates will have been in effect approximately nine months. Therefore, under the requirements of order no. 4462, and the terms of the refund bond, the company must refund to its subscribers 9/12ths of the excess collected over the increases now made permanent by this order. The excess is the sum of $2,073,500 on an annual basis and the refund will be 9/12ths of that amount, or approximately $1.5 million. This refund shall be in the form of a credit on all bills rendered on and after September 1, 1969, until each individual refund has been made.

## Findings

On the basis of the record herein, the commission finds that substantial improvements have been made in the quality of service provided by Southern Bell in Florida, but its service is not yet sufficiently adequate and efficient to justify the full increases previously authorized, under bond, on a temporary basis. The company by the effective date of this order, will have completed 35% of its current two-year (1969-1970) improvement program, and, thus, has been able to bring about substantial improvement in service. On this basis, we find it is fair and reasonable to allow the utility 35% of that portion of the temporary increases which can be related to quality of service, that is, 35% of the sum of $3,190,000 as previously discussed herein, on a permanent basis.

We further find that the company should refund to its subscribers 9/12ths of the sum of $2,073,500, which represents the amount collected by the company in excess of the 35%, which we have found herein to be reasonable on a permanent basis.

We further find that the company should be required to reduce its rates for business and residence service by the full amount of the temporary increases imposed on such service.

We further find that all other increases previously granted on a temporary basis should now be made permanent, and that the bond required in this proceeding should be vacated as soon as the reductions and refunds required by this order have been completed to the satisfaction of the commission.

It is therefore ordered that effective with its September 1969 billing cycle, Southern Bell Telephone and Telegraph Company shall reduce its business and residence rates, and make the appropriate refunds, consistent with the intent of this order as indicated by the discussions and findings herein.